## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **Nicholas D. Aune** | **Civil No. 09-0015 (JNE / SRN)** |
| **Plaintiff,** | |
| v. | **REPORT & RECOMMENDATION** |
| **Cal Ludeman, Commissioner, Minnesota Department of Human Services; Dr. Sanne Magnan, Commissioner, Minnesota Department of Health,** | |
| **Defendants.** | |

Nicholas D. Aune, 1111 Highway 73, Moose Lake, Minnesota 55101, Pro Se

Ricardo Figueroa, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1100, St. Paul, Minnesota 55101, for Defendants.

This matter comes before the undersigned United States Magistrate Judge on Plaintiff's Motion for an Emergency Restraining Order and Preliminary Injunction (Doc. No. 3); Motion to Appoint Counsel (Doc. No. 5); Motion to Expedite (Doc. No. 9); and Motion to Compel Defendants to Respond to Plaintiff's Motion for Emergency Restraining Order and Preliminary Injunction (Doc. No. 15).  The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a).

## I.  FACTUAL AND PROCEDURAL HISTORY

Plaintiff, a patient civilly committed to the Minnesota Sex Offender Program ("MSOP") in Moose Lake, Minnesota, pursuant to Minn. Stat. 253F.02, Subd. 18(c), commenced this action in January 2009.  Plaintiff seeks relief under Section 1983 for alleged violations of his federal constitutional rights stemming from facility overcrowding, specifically "double-bunking"

conditions.[1]  Plaintiff's Complaint seeks damages and a declaration that his federal rights have been violated.  (Doc. No. 1.)

Along with the Complaint, Plaintiff simultaneously filed a Motion for an Emergency Restraining Order and Preliminary Injunction (Doc. No. 3), claiming the threat of irreparable harm caused by the double-bunking conditions.   Plaintiff reiterated certain allegations in his Complaint, namely, that on or about November 21, 2008, he was moved from a double room without a toilet, located in an annex building into a considerably smaller double-bunked room with a toilet located in the MSOP main building.  Although he acknowledges that his request for a particular roommate was honored, Plaintiff argues that he "is still forced to double bunk with another sex offender alleged to have psychological and/or mental disorders that constitutes him as either a Sexually Dangerous Person or a Sexual Psychopathic Personality, or both."  (Mem. Supp. Mot. TRO & Prelim. Inj. at 3, Doc. No. 4.)  Plaintiff alleges that the usable floor space at the Moose Lake facility has been reduced, pursuant to a Minnesota Department of Health ("MDH") rule waiver, from 60 square feet per patient to 26.5 square feet per patient.  (Id. at 4.)  Such conditions amount to overcrowding, Plaintiff argues, and have adversely affected his health, treatment, comfort, safety and well-being.  Plaintiff alleges that these conditions violate the Fifth, Eighth and Fourteenth Amendments.  (Id.)

Defendants respond that MSOP's  patient population has increased over the past few years, leading to a need for more space.  (Aff. of G. Carlson, ¶ 4, Doc. No. 19-2, in Supp. of Defs.' Mem. in Opp.)  The sex offender program is currently building new facilities, but until those facilities are complete, MSOP requested and was granted a waiver by MDH to use double-

---

[1]"Double-bunking," also known as "double-celling," is the practice of placing two inmates in one cell.  In Plaintiff's particular case, the cell beds are also bunk beds.

bunking within the program. (Id. at ¶¶ 7-8; 19.) MSOP administrators permit patients to request their own roommates and Defendants maintain that they carefully assign roommates to ensure the safety and security of the patients. (Complaint ¶ 9, Carlson Aff. ¶ 21.) As noted, Plaintiff's request for a particular roommate was honored and he shares a room with his own bed and storage areas. The facility also has common spaces and the patients are not required to be in their rooms while they are awake for any significant amounts of time. (Carlson Aff. ¶ 20.)

## II. DISCUSSION

### A. TRO/Preliminary Injunction

Plaintiff requests a temporary restraining order ("TRO")[2] and/or preliminary injunction requiring Defendants to: (1) refrain from further double-bunking mental health patients in the MSOP building until further inquiry into their mental well-being; (2) place Plaintiff and similarly situated persons in single-patient rooms; (3) immediately cease and desist the double-bunking practice, should the Court find it unconstitutional; and (4) comply with the legislative intent of Minn. Stat. § 144.651, subd. 1, "to promote the interests and well being of the patients and residents of health care facilities." (Mot. for TRO and Prelim. Inj. at 1-2.)

The Court first notes that the separation of powers requires that courts must exercise "judicial restraint" in response to complaints regarding the operation of prisons by executive and legislative branches. See Turner v. Safley, 482 U.S. 78, 84-85 (1987). This reluctance is particularly pronounced where a state prisoner seeks relief in federal court. Id. at 85 (noting that principles of federalism impose an "additional reason to accord deference to the appropriate prison authorities" where a state prisoner brings suit in federal court); see Sandin v. Connor, 515

---

[2]While Plaintiff characterizes this as an "emergency restraining order," the Court refers to it herein as a temporary restraining order or TRO.

U.S. 472, 482 (1995) ("[F]ederal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.").

This Court may grant a preliminary injunction or TRO only upon a proper showing of (1) the probability of success on the merits, (2) that the movant will suffer irreparable harm absent the injunction, (3) the balance between this harm and the harm an injunction would cause other parties, and (4) where the public interest lies. Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113-14 (8th Cir. 1981) (en banc); Northwest Airlines, Inc. v. Filipas, 07-CV-4803 (JNE/JJG), 2008 WL 251872 at *1, n. 1 (D. Minn. Jan. 30, 2008) (stating that the Dataphase factors ordinarily apply both to requests for a TRO or a preliminary injunction.) The movant bears the burden of proof for each factor. Gelco v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

### 1. Likelihood of Success on the Merits

As to the first Dataphase factor, likelihood of success on the merits, this Court is bound by legal precedent addressing the constitutionality of double-bunking. Two landmark Supreme Court decisions regarding claims of prison overcrowding are Bell v. Wolfish, 441 U.S. 520 (1979), and Rhodes v. Chapman, 452 U.S. 337 (1981). In Bell, pretrial detainees and prisoners at the minimum security Metropolitan Correctional Center in New York City raised issues related to overcrowding, challenging a policy change that required them to share cells with other inmates on a short-term basis. 441 U.S. at 523-34. The Supreme Court held that a court facing such a claim must decide whether the particular restriction or condition is imposed for the purpose of punishment or whether it is "but an incident of some other legitimate governmental purpose." Id. at 538 (citations omitted). Weighing the pretrial detainees' rights against the interests of the facility, the Court stated,

> [i]n addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment.

The Court held that no intent to punish the pretrial detainees was demonstrated, particularly as the facility administrators maintained that the policy change was a short-term measure to deal with an increase in prison capacity. Id. at 541.

In Rhodes, two inmates at the Southern Ohio Correctional Facility challenged the facility's long-term double bunking policy under the Eighth and Fourteenth Amendments. 452 U.S. 337. The inmates argued that, unlike Bell, the double-bunking was long-term, and that physical and mental injury would be sustained through such close contact and limited space for movement. Plaintiffs sought an injunction barring the prison facility from housing more than one inmate in a cell, except as a temporary measure. Id. at 340. The Court, however, held that such long-term double-bunking was not cruel or unusual, nor was it per se unconstitutional. The Court held that the Eighth Amendment's "cruel and unusual" prohibition is to be construed in a "flexible and dynamic manner." Id. at 346 (citing Gregg v. Georgia, 428 U.S. 153, 171 (1976)). The Court further held that "when the conditions of confinement compose the punishment at issue," those conditions "must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." Considering all the factors, the Court found no evidence showing that Ohio authorities were wantonly inflicting pain nor did the conditions, considered in their totality, constitute a serious need deprivation.

Relying upon Rhodes, the Eighth Circuit addressed the same issue in Cody v. Hillard, 830 F.2d 912, 916 (8th Cir. 1987), a class action brought by inmates alleging overcrowding. The inmates filing suit sought to cease the practice of double-bunking at the South Dakota State

Penitentiary, both in the general population and the protective custody population. The Eighth Circuit held that the practice was not cruel and unusual punishment as it did not lead to deprivations of essential food, medical care or sanitation, or increase violence among inmates or create conditions intolerable for prison confinement. Id. at 914. In addition, the Eighth Circuit noted that the prison administration had taken various steps to reduce the negative impact of double-bunking. Id. The Eighth Circuit's conclusions regarding the constitutionality of double-bunking applied equally to persons housed in the protective custody area of the facility. Id. at 915-16.

Here, Plaintiff challenges MSOP's practice of double-bunking, a practice held constitutional by the Supreme Court in Bell and Rhodes and by the Eighth Circuit in Cody. Those decisions hold that requiring two inmates to share a cell does not constitute cruel and unusual punishment under the Eighth Amendment. In this instance, the current double-bunking practice is temporary, as new facilities are being built for the sex offender program. (Complaint ¶ 15; Carlson Aff. ¶ 7.) The new facility is expected to be completed by September 2009. (Carlson Aff. ¶ 9.) Moreover, as in Cody, the administration at MSOP has taken steps to reduce the negative impact of double-bunking by allowing, and granting, roommate preferences. Plaintiff himself selected the roommate of his choice. Based on legal precedent and the facts of this case, the court finds that the likelihood of Plaintiff's success on the merits – the first Dataphase factor – is negligible and therefore weighs against granting his request for a preliminary injunction/TRO.

**2.     Irreparable Harm**

The irreparable harm must be more than a "mere possibility" of future harm, but rather, there must be a cognizable danger. C.H. v. Sullivan, 718 F.Supp. 726, 730 (D. 1989) (citing

Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982)). Injunctive relief is not appropriate when the harm is merely speculative or based on a mere assumption of possible results. Cargill, Inc. v. Hartford Accident & Indem. Co., 531 F.Supp. 710, 715 (D. Minn. 1982).

Plaintiff contends that double-bunking adversely affects his health, treatment, comfort, safety and well-being. (Pl.'s Mem. Supp. Mot. TRO & Prelim. Inj. at 5.) He argues that expert testimony cited in Fischer v. Winter, 564 F.Supp. 281 (N.D. Cal. 1983), "has established as a general proposition that overcrowding in a prison context increases stress, that excessive levels of stress may induce or aggravate physical illness and mental or emotional disturbance, and that overcrowding correlates with both suicidal and assaultive behavior." (Pl.'s Mem. Supp. Mot. TRO & Prelim. Inj. at 5-6.) Plaintiff argues that if he were to refuse double-bunking, the alternative would be placement in a protective isolation cell, in which he would be removed from treatment, lose his work hours and lose the ability to move freely about the facility. He contends that he would also lose the ability to use his personal property, with limited exceptions.

At present, Plaintiff alleges that he has systematically lost much of his personal property in order to accommodate for double-bunking at MSOP; for example, he is required to use prison sheets and towels. (Complaint ¶ 13.) In addition, he states that double-bunking has reduced the availability of electrical outlet usage from six outlets to three, rendering Plaintiff unable to utilize certain allowable electrical items. (Complaint ¶ 15.) Also as a result of double-bunking in a cell that includes a toilet, Plaintiff alleges that he is subjected to foul odors when his roommate uses the toilet facilities, leading to nausea and occasional headaches. (Complaint ¶ 16.) Due to space limitations in the double-bunked cell, Plaintiff also complains of being unable to hang his towels to adequately dry, which causes a musty smell. (Complaint ¶ 17.)

As to the current harm described by Plaintiff, the Court does not mean to minimize

Plaintiff's privations, however, as an administrative matter, MSOP may impose conditions that interfere with Plaintiff's desire to live as comfortably as possible. That imposition on Plaintiff's comfort does not render double-bunking punitive, much less cruel and unusual: "[t]he Constitution does not mandate comfortable prisons, and prisons of [the maximum security type], which house persons convicted of serious crimes, cannot be free of discomfort. Thus, these considerations properly are weighed by the legislature and prison administration rather than a court." Rhodes, 452 U.S. at 349. While Plaintiff is a civilly-committed person, and not an inmate serving a sentence in a maximum security prison, the holding in Bell applied to pretrial detainees and the holding in Cody applied equally to convicted prisoners and persons in protective custody. In both cases, the courts held that double-bunking, and the alleged harms resulting from that practice, did not violate the Constitution.

Moreover, the Court finds that certain of the harms alleged by Plaintiff are speculative. Plaintiff argues that excessive stress "may" induce or aggravate physical illness and mental or emotional disturbance, without a showing of any real threat of irreparable harm to himself. He also states that overcrowding "correlates" with both suicidal and assaultive behavior. The harm that Plaintiff describes if he were to refuse double-bunking is also speculative.

In sum, the temporary double-bunking practice at MSOP does not rise to a cognizable danger necessary to show irreparable harm. Accordingly, Plaintiff has not met the burden of proof with respect to the second Dataphase factor.

### 3. Balance Between This Harm and Harm an Injunction Would Cause Other Parties

The third Dataphase factor requires the Court to balance the harm alleged by Plaintiff against the harm an injunction would cause other parties. Plaintiff alleges harm consisting of potential stress, uncomfortable living conditions, foul odors and limitations on personal property.

Defendants contend that their main objective is to provide treatment to persons deemed "sexually dangerous" or "sexually psychopathic." While new facilities are being built for the MSOP program, Defendants remain obliged to treat every civilly-committed sex offender in the MSOP and to have open beds available at all times to accommodate an irregular admission rate. (See Carlson Aff. ¶ 6.) Without double-bunking, Defendants contend that the facility would not have enough beds available for civilly-committed persons, leading to persons going untreated or to MSOP running treatment programs in different facilities throughout the state. Defendants posit that either situation would result in little or no treatment for sex offenders.

Balancing the relative harms, the Court concludes that issuing an injunction or TRO, as Plaintiff requests, would cause a greater harm than the harm alleged by Plaintiff. Defendants would not have enough space to treat civilly-committed persons, who would go untreated, or be housed in other state prison facilities, scattered throughout the state. The consistency and availability of treatment would be handicapped and the administration of the sexual offender program would be seriously jeopardized. This balance of harm factor weighs against the issuance of an injunction/TRO.

### 4.    Public Interest

The final Dataphase factor, the public interest, weighs against Plaintiff. While there is certainly an interest in affording committed sexual offenders an optimal environment in which to receive treatment, the public interest is greater in providing consistent, uninterrupted treatment to all those persons who qualify for sexual offender treatment. Defendants maintain that until the new facility is available, they have been dealing with space limitations to the best of their ability. They applied for and received a waiver from the MDH to ensure that all rooms were within the statutory minimum standards. They continue to provide treatment, food, medical care and

9

sanitary and safe conditions.

In sum, each of the Dataphase factors weighs against granting Plaintiff a preliminary injunction or TRO. The Court recommends that his motions be denied.

### B. Appointment of Counsel

Plaintiff has requested that the Court appoint counsel to represent him in this matter. Pro se litigants do not have a constitutional or statutory right to counsel in civil cases. Stevens v. Redwing, 146 F.3d 538, 546 (8th Cir. 1998). Rather, the appointment of counsel in cases such as this one is a matter committed to the discretion of the trial court. McCall v. Benson, 114 F.3d 754, 756 (8th Cir. 1997); Mosby v. Mabry, 697 F.2d 213, 214 (8th Cir. 1982). Among the factors the court should consider in determining whether to appoint counsel are the factual complexity of the case, the ability of the litigant to present his claims, the complexity of the legal issues and whether both the litigant and the court would benefit from having the litigant represented by counsel. McCall, 114 F.3d at 756; Johnson v. Williams, 788 F.2d 1319, 1322-23 (8th Cir. 1986).

The Court finds that neither the facts nor the legal issues involved in this case are so complex as to warrant appointment of counsel. It appears to the Court that Plaintiff possesses the ability to articulate his claims and to argue his positions, and that he will be able to communicate effectively with the Court. Moreover, the Court is presently satisfied that appointment of counsel would not substantially benefit the Court or Plaintiff. Therefore, Plaintiff's request for counsel should be denied.

### C. Motion to Expedite Motion for TRO/Motion to Compel Defendants to Respond to Plaintiff's TRO Motion

Plaintiff seeks the Court's review of the instant motions on an expedited basis and also has moved to compel Defendants to respond to the instant motions. As Defendants have

responded at this time and as this Report & Recommendation addresses the instant motions, the Court recommends that Plaintiff's Motion to Expedite and Motion to Compel be denied as moot.

## III. CONCLUSION

Plaintiff has failed to make any showing of likely success on the merits or of irreparable injury so as to warrant preliminary injunctive relief.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1. Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 3) be **DENIED**;

2. Plaintiff's Motion to Appoint Counsel (Doc. No. 5) be **DENIED**.

3. Plaintiff's Motion to Expedite (Doc. No. 9) be **DENIED AS MOOT**.

4. Plaintiff's Motion to Compel Defendants to Respond to Plaintiff's Motion for Emergency Restraining Order and Preliminary Injunction (Doc. No. 15) be **DENIED AS MOOT**.

Dated: May 12, 2009

s/Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **May 27, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the

Court of Appeals.